*FILED*

JUN 2 6 2008

U.S. DISTRICT COURT
CLARKSBURG, WV 26301

**CLAUDE E. BROWN,**

   **Plaintiff,**

v.            **Civil Action No. 5:07CV54**
            **(Judge Stamp)**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

   **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

   This is an action for judicial review of the final decision of the defendant Commissioner of

the Social Security Administration ("Defendant," and sometimes "the Commissioner") denying

Plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act.

The matter is awaiting decision on Plaintiff's Motion for Judgment on the Pleadings, or, in the

Alternative, Motion for Remand for Consideration of New Evidence and Defendant's Motion for

Summary Judgment and has been referred to the undersigned United States Magistrate Judge for

submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B);

Fed. R. Civ. P. 72(b); L.R. Gen. P. 83.12.

## I. PROCEDURAL HISTORY

   Claude E. Brown ("Plaintiff") filed an application for DIB on September 29, 2003, alleging

disability due to diabetes, high blood pressure, and heart attack (R. 99, 112). Plaintiff's application

was denied at the initial and reconsideration levels (R. 73-76, 80-84). Plaintiff requested a hearing,

which Administrative Law Judge Douglas N. Jones ("ALJ") held on March 2, 2005 (R. 27).

Plaintiff, represented by counsel Kelsey C. Burnette, testified on his own behalf (R. 31-56, 67-69).

Also testifying at the hearing was Vocational Expert J. Herbert Pearis ("VE") (R. 56-67). On June 2, 2005, the ALJ entered a decision finding Plaintiff was not disabled because he could perform his past relevant work (R. 20-26). Plaintiff timely filed a request for review to the Appeals Council (R. 15). On March 27, 2007, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 6-8).

## II. FACTS

Plaintiff was born on September 28, 1957, and was forty-eight years old at the time of the administrative hearing (R. 33, 99, ). He has an eleventh-grade education. His past relevant work included that of quality control inspector. Plaintiff has not worked since May, 2003 (R. 33, 34, 113).

On November 2, 1977, Plaintiff presented to the emergency room of Overlook Hospital, in Summit, New Jersey, with three crushed fingers on his right hand, which he had "crushed . . . in machine" (R. 156, 158). Plaintiff's third and fourth fingers were amputated; his second finger was repaired (R. 160).

Plaintiff began treatment at Plainfield Health Center on September 4, 1991, for treatment of his diabetes (R. 188). Plaintiff was treated for diabetes there on August 31, 1993; October 12, 1993; January 28, 1994; February 15, 1994; February 18, 1994; April 19, 1994; June 8, 1998; July 22, 1998; September 23, 1998; and December 23, 1998.

On April 7, 2000, Plaintiff presented to Muhlenberg Regional Medical Center with dizziness and weakness after having been involved in an automobile accident. Plaintiff was found to be hypoglycemic; his blood sugar was 54. After consuming a meal, Plaintiff's blood sugar was 145 and he was released to home (R. 201).

Plaintiff received treatment for his diabetes at Plainfield Health Center on February 5, 2002;

2

April 23, 2002; May 8, 2002; August 7, 2002; and November 6, 2002 (R. 167-69,170-72, 174, 177-84, 186-87).

On April 25, 2002, Plaintiff presented to the emergency department of the Muhlenberg Regional Medical Center. He reported he had passed out at work. He was diagnosed with hypoglycemia (R. 207).

Plaintiff was admitted to in-patient care at Muhlenberg Regional Medical Center on October 24, 2002, for treatment of diabetic ketoacidosis[1] (R. 220, 222). Plaintiff's discharge summary read that, upon admission, Plaintiff had positive troponins[2]. He was treated with an insulin drip, which controlled glucose levels. Plaintiff underwent a cardiac catheterization, which "showed that he had normal coronary vessels." The cardiac catheterization did show a "moderate to severe one vessel coronary artery disease involving the diagonal branch of the" left anterior descending coronary artery. It was recommended that Plaintiff undergo "maximization of medical therapy" for this condition. Plaintiff's systolic function was noted as "preserved" (R. 222, 236, 257-58). Plaintiff's chest x-ray showed "no radiographic evidence of acute infiltrate or effusion" (R. 247). An x-ray of Plaintiff's left knee showed soft tissue swelling anterior to the patella (R. 249). Plaintiff was discharged to home on November 17, 2002, with instructions to follow a low fat, low sodium, diabetic diet; follow up with cardiology; attend diabetic classes; and medicate with 25mg Lopressor and insulin (R. 222).

---

[1] Diabetic ketoacidosis: a type of metabolic acidosis produced by accumulation of ketone bodies resulting from uncontrolled diabetes mellitus. *Dorland's Illustrated Medical Dictionary*, 29th Ed., 2000, at 17.

[2] Troponin: a complex of globular muscle proteins of the I band that inhibits contraction. *Dorland's Illustrated Medical Dictionary*, 29th Ed., 2000, at 1955.

On April 10, 2003, Plaintiff was admitted to Muhlenberg Regional Medical Center for chest pain (R. 288). Plaintiff stated he had consumed an "excessive amount of alcohol" that date and he felt "his sugar start to drop" (R. 290, 294). Plaintiff reported he had lost his job a few days earlier and had been "upset all weekend." Plaintiff informed the attending physician that he had been experiencing chest pains "with progressive shortness of breath on exertion" for the "past few months." Plaintiff reported difficulty climbing stairs, due to experiencing shortness of breath (R. 290). The examinations of Plaintiff's HEENT, heart, lungs, abdomen, and extremities were normal (R. 292). Plaintiff was treated with insulin, which "resolved" his hypoglycemia, and intravenous fluids (R. 295).

On April 24, 2003, Plaintiff underwent a nuclear stress test. Plaintiff was negative for chest pain on the exercise treadmill stress test and negative for ischemia during the EKG. Plaintiff's heart rate and blood pressure responses were appropriate. The nuclear imaging revealed a "defect involving the inferior apical wall of the myocardium with normal wall motion of the segment consistent with soft tissue attenuation." It was recommended that Plaintiff continue with "medical therapy" (R. 287).

On July 30, 2003, Plaintiff became a patient of Dr. Sarita Bennett. Plaintiff reported he had diabetes and had been insulin dependent for twenty-five years and that he had a myocardial infarction in October, 2002. Plaintiff's complaints were for mild chest pain, wheezing, shortness of breath, and occasional heartburn. Plaintiff reported smoking one package of cigarettes per day and occasionally consuming alcohol. Dr. Bennet diagnosed Type I diabetes mellitus, hypertension, increased lipids, and coronary artery disease. Plaintiff was prescribed Isosorbide Monitrate, Endepril, Coreg, Plavix, Zocor, and Humulin (R. 280).

On August 29, 2003, Plaintiff presented to Dr. Bennett with right arm pain. Plaintiff reported he had reduced his smoking to one-half pack per day. Dr. Bennett noted Plaintiff's cholesterol was 211 and triglycerides were 82 on August 15, 2002, and his cholesterol was 145 and triglycerides were 129 on October 29, 2002. Dr. Bennett found Plaintiff's hypertension and diabetes were stable. She continued treating Plaintiff's coronary artery disease with Coreg. She prescribed Celebrex for the right arm pain associated with Plaintiff's partial right hand amputation (R. 279).

On September 30, 2003, Plaintiff reported to Dr. Bennett that he had no complaints. He had "good days & bad days." Plaintiff reported he was "tired" and had to "force" himself to "do things." Plaintiff reported he was stressed and he experienced occasional muscle tightness in his chest. Plaintiff's hyperlipidemia and coronary artery disease were stable. Dr. Bennett prescribed Zocor and Coreg to treat those conditions and Actos for treatment of diabetes (R. 278).

On October 9, 2003, a state-agency physician completed a Physical Residual Functional Capacity Assessment of Plaintiff. It was determined that Plaintiff could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and push/pull unlimited (R. 303). Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations (R. 304-06).

On October 30, 2003, Plaintiff reported to Dr. Bennett that his right hand pain was only minimally relieved with Celebrex. He stated that cold weather made the pain worse. Dr. Bennett prescribed Avandia for Plaintiff's diabetes, Coreg for his coronary artery disease, and Lorcet for his right hand pain (R. 277).

On December 1, 2003, Plaintiff reported to Dr. Bennett that he was "doing well overall," he

was experiencing "less stress," and he was "eating better." Plaintiff's coronary artery disease was stable. Plaintiff reported right hand pain due to cold weather. Dr. Bennett prescribed Avandia for Plaintiff's diabetes and Lorcet for right hand pain (R. 276).

On January 28, 2004, Dr. Bennett wrote a letter, directed "To whom it may concern," wherein she opined that Plaintiff had a "long standing history of Type I (insulin dependent) diabetes." Dr. Bennett wrote that Plaintiff's right hand had been partially amputated over twenty years earlier and that he'd had a myocardial infarction at the age of 44. She noted Plaintiff's hypertension and hyperlipidemia were controlled with medication. Dr. Bennett opined that, due to the severity of Plaintiff's multiple medical conditions, Plaintiff was disabled (R. 311).

On February 9, 2004, Plaintiff reported to Dr. Bennett he had fallen and hurt his "tail bone." Plaintiff stated he had severe back pain, sitting caused back pain, walking did not cause pain, and heat helped relieve his back pain. Upon examination, Dr. Bennett found Plaintiff had no edema. Plaintiff's sacral area was extremely tender. Plaintiff was neurologically intact. Dr. Bennett prescribed Kenalog for Plaintiff's left hip pain and Percocet for his sacral contusion. Dr. Bennett found Plaintiff's right hand pain was stable on medication (R. 275).

A February 26, 2004, left hip x-ray was negative (R. 286).

On March 25, 2004, Lisa C. Tate, a psychologist, and Kimberly Caudell, a supervised psychologist, completed a Psychological Evaluation of Plaintiff. Assessment testing tools used were a mental status evaluation, the Cognistat, and the Wechsler Adult Intelligence Scale – Third Edition (R. 312). The results of the Cognistat were invalid "as he gave up rather easily and required a good deal of encouragement during this portion of testing" (R. 317).

Plaintiff's chief complaints were that he lived with his girlfriend and that the entire household

income consisted of his girlfriend's job and food stamps, and that he had health and memory problems. Plaintiff's grooming and personal hygiene were fair, he walked with a left leg limp, he had a slouched posture, he had fair use of his upper limbs, he had no speech problems, he drove himself to the interview, and he was fairly cooperative and responsive (R. 312).

Plaintiff reported to Psychologist Tate that he had memory problems, which began after his heart attack in 2002, and which included difficulty remembering to take his medications and remembering his children's birthdays (R. 312). Plaintiff reported his decreased memory had "been about the same over time" since the heart attack. In addition to memory problems, Plaintiff reported feeling depressed "sometimes;" difficulty sleeping in that he woke frequently and slept about four hours nightly; varying appetite; difficulty concentrating; and infrequent periods of crying. Plaintiff reported his mood as "'tired'" (R. 313).

Plaintiff reported he had no recent illnesses, injuries, or hospitalizations, but that he had diabetes, hypertension, vision problems, heart problems, chest pain, breathing problems, arthritis, left hip problems, left knee problems, right hand problems, and left hand problems. Plaintiff reported he was medicating with an unknown insulin medication, unknown hypertension medication, Plavix, Celebrex, Coreg, Zocor, hydrocodone, and two other unknown medications. Plaintiff reported he smoked less than one pack of cigarettes per day, had smoked for fifteen to twenty years, and consumed alcohol infrequently, usually only on "special occasions." Plaintiff also reported he had sought mental health treatment fifteen years earlier when his fingers had been amputated, but had been released from care after six months (R. 313).

Plaintiff informed Psychologist Tate that he had been schooled in regular education classes, had to repeat the third grade, and then quit school in the eleventh grade to enter the workforce, as

his stepfather had been injured and could no longer work to support the family. Plaintiff stated he had last worked in 2002 as a shipping/receiving worker, but was laid off after his heart attack because he could no longer perform the job of lifting (R. 314).

Plaintiff reported he had no sleep schedule. His activities of daily living included rising, eating breakfast, taking medications, watching television, taking a nap, eating lunch, watching television, eating dinner, watching television and then going to bed. Plaintiff reported he drove to his girlfriend's house and then to church once a week and he drove to appointments if required (R. 318).

Psychologist Tate found Plaintiff was alert; he was oriented to person, place, time and date; his observed mood was depressed; his affect was restricted; his thought processes appeared logical and coherent; he was not delusional, obsessive, or compulsive; his insight was fair; his judgment was moderately deficient; he had no suicidal or homicidal ideations; his immediate, recent, and remote memories were within normal limits; his concentration was mildly deficient; his psychomotor behavior was normal; his pace was mildly deficient; his persistence was mildly to moderately deficient; and he was moderately deficient in his social functioning (R. 314-15, 318).

Plaintiff's Verbal IQ was 80, his Performance IQ was 70, and his Full Scale IQ was 74 on the WAIS-III (R. 316). The results were considered valid. Psychologist Tate found the following: Axis I – depressive disorder NOS and Axis II – borderline intellectual functioning (R. 316-17). Psychologist Tate found Plaintiff could manage his own benefits (R. 318).

On April 6, 2004, a State-agency reviewing physician completed a Physical Residual Functional Capacity Assessment of Plaintiff. He found Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for a total of about six

hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and was limited in his pushing and/or pulling with his upper extremities (R. 321). He found Plaintiff could never climb a rope and was limited to occasionally climbing ramps, stairs, ladders, and scaffolds; balancing; stooping; kneeling; crouching; and crawling (R. 322). Plaintiff was unlimited in his ability to reach in all directions, but was limited in his handling, fingering, and feeling with his right hand (R. 323). He had no visual or communication limitations (R. 323). The State-agency reviewing physician found Plaintiff was unlimited in his exposure to extreme heat, wetness, humidity, noise, fumes, odors, dusts, gases, and poor ventilation, but he should avoid concentrated exposure to extreme cold (due to pain in his right hand), vibrations, and hazards (R. 324). The reviewing physician reduced Plaintiff's RFC to light "based on ADL's [going to church]; Plaintiff's myocardial infarction in October, 2002, "even though stress test very good;" and Plaintiff's right hand amputation, hypertension, poorly controlled diabetes, and arthralgias (R. 325).

On April 7, 2004, Plaintiff reported to Dr. Bennett that he was feeling well, except for right hand pain, for which he was prescribed Percocet (R. 335).

On April 17, 2004, State agency reviewing psychologist Robert Solomon, Ph.D., completed a Mental Residual Functional Capacity Assessment of Plaintiff. He found Plaintiff's abilities to remember locations and work-like procedures and understand and remember very short and simple instructions were not significantly limited and his ability to understand and remember detailed instructions was moderately limited (R. 336). Dr. Solomon found Plaintiff's ability to carry out very short and simple instructions; ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; ability to sustain an ordinary routine without special supervision; ability to work in coordination with the proximity to others without

being distracted by them; ability to make simple work-related decisions; ability to complete a normal workday and workweek without interruptions from psychologically based symptoms; and ability to perform at a consistent pace without an unreasonable number and length of rest periods were not significantly limited (R. 336-37). Dr. Solomon opined Plaintiff's ability to maintain attention and concentration for extended periods of time and his ability to carry out detailed instructions were moderately limited (R. 336). Dr. Solomon found Plaintiff was not significantly limited in his ability to interact appropriately with the general public; ability to ask simple questions or request assistance; ability to accept instructions and respond appropriately to criticism from supervisors; ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. He also found Plaintiff was not significantly limited in his ability to respond appropriately to changes in the work setting; to be aware of normal hazards and take appropriate precautions; to travel in unfamiliar places or use public transportation; and to set realistic goals or make plans independently of others (R. 337). Dr. Solomon noted Plaintiff's moderate limitations were due to his memory problems and that he "did & could perform [several]-step tasks in work-like setting" (R. 338).

Dr. Solomon also completed a Psychiatric Review Technique of Plaintiff, determining he had an organic mental disorder (borderline IQ) and an affective disorder (R. 340). Dr. Solomon found Plaintiff had no restrictions of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. He opined Plaintiff had had no episodes of decompensation (R. 350). Dr. Solomon further opined that Plaintiff's complaints of memory problems were "not supported by objective . . . evidence" (R. 352).

On May 17, 2004, Plaintiff reported to Dr. Bennett that he had discovered a lump in his groin as he was traveling to home from Maryland. Dr. Bennett incised the area and provided samples of Augmentin (R. 334).

On June 1, 2004, Plaintiff informed Dr. Bennett he needed his Percocet refilled for his right hand pain. Plaintiff complained of left hip pain. He reported he had lost ten pounds. Dr. Bennett continued Plaintiff on Percocet and instructed him to continue dieting and consider increasing Avandia (R. 333).

On July 2, 2004, Plaintiff reported he had been "feeling 'fair.'" Dr. Bennett prescribed Lorcet, Plavix, and Avandia to Plaintiff (R. 332).

On August 5, 2004, Plaintiff reported to Dr. Bennett that he had presented to the emergency room the previous week for back pain. He stated he had lain "down Friday night & couldn't get up Saturday" morning. Plaintiff reported an x-ray revealed he had a chipped bone in his back. He reported tightness in his back, but the pain was not as bad as it had been. Dr. Bennett found Plaintiff's lower right spine had a tenderpoint and spasm (R. 331). She diagnosed lumbar strain, for which she recommended application of moist heat.

On September 8, 2004, Plaintiff informed Dr. Bennett he experienced stomach pain and hand pain. Dr. Bennett noted Plaintiff's coronary artery disease and hypertension were stable. She prescribed Zantac for Plaintiff's GERD and Percocet for his right hand pain (R. 330).

On September 22, 2004, Dr. Bennett wrote a letter, directed "To Whom It May Concern," in which she wrote that Plaintiff could not "sustain exertion greater than a few minutes" due to Type I diabetes mellitus and a 2002 myocardial infarction. Dr. Bennett wrote Plaintiff's partial right hand amputation caused pain, which was unpredictable; could "interfere with his ability to concentrate;"

and restricted his ability to lift, carry, pull, or push. Dr. Bennett also noted Plaintiff had been treated for hyperlipidemia and osteoarthritis. Dr. Bennett opined Plaintiff was disabled and could "not maintain a reliable work schedule or perform work activities involving any exertion" (R. 359).

Also on September 22, 2004, Dr. Bennett completed a Physical Capacities Evaluation of Plaintiff. She identified Plaintiff's symptoms as coronary artery disease and right hand partial amputation with recurrent pain. Dr. Bennett found Plaintiff's impairments had lasted more than twelve months and "often" interfered with his attention and concentration (R. 360). She opined Plaintiff could occasionally lift and/or carry one to ten pounds during a normal workday; could sit continuously for thirty minutes at a time; stand and/or walk for ten minutes at a time; sit for a total of two hours in an eight-hour workday; and stand and/or walk for a total of one hour in an eight-hour workday (R. 360-61). Dr. Bennett found Plaintiff should avoid dust, fumes, gases, extremes of temperature, humidity and other environmental pollutants. She opined Plaintiff should rarely push/pull; never climb and balance; rarely use gross manipulation; rarely use fine manipulation; occasionally bend and/or stoop; rarely reach; frequently operate motor vehicles; and never work with or around hazardous machinery. Dr. Bennett opined Plaintiff would be absent from work more than four days per month as a result of his impairments or treatments therefor (R. 361).

On September 29, 2004, Plaintiff reported to Dr. Bennett that he experienced difficulty breathing, left hand numbness and tingling, and right hand pain. Dr. Bennett diagnosed diabetes; right hand pain, for which she prescribed Percocet; asthma, for which she prescribed Advair; and carpal tunnel syndrome, for which she recommended stretching (R. 329, 378).

On October 1, 2004, Plaintiff presented to the emergency room for elevated blood sugar level. Plaintiff reported he had been unresponsive at home and that he had not eaten since breakfast

(R. 365). The emergency department physician instructed Plaintiff to consume regular meals and monitor his glucose four times per day (R. 367).

On October 29, 2004, Plaintiff reported to Dr. Bennett that he had again been treated at the emergency room. He informed her that he had sneezed and his neck had popped. Dr. Bennett instructed Plaintiff to continue his current medications for diabetes, eat small, frequent meals, and increase exercise. Dr. Bennett prescribed Enalapril for hypertension, Advair for asthma, Keflex for a nodule on the third finger of his left hand, and Percocet for right hand pain (R. 377).

On November 30, 2004, Plaintiff reported to Dr. Bennett he had experienced vomiting, diarrhea, sneezing, and coughing. Plaintiff stated he had been feeling well before the above symptoms. Plaintiff informed Dr. Bennett he had right hand pain, for which she prescribed Percocet. Plaintiff was diagnosed with upper respiratory infection and stable diabetes (R. 376).

On January 3, 2005, Plaintiff reported to Dr. Bennett that his left shoulder throbbed "like a toothache." Plaintiff stated that movement did not increase the shoulder pain and that it sometimes responded to moist heat. Dr. Bennett prescribed Zocor for Plaintiff's lipids, Isosorbide Monitrate for his coronary artery disease, and Percocet for osteoarthritis (R. 375).

On January 24, 2005, Plaintiff reported to Dr. Bennett his blood sugar had dropped earlier in the week. He reported he had eaten lunch and then fallen asleep. Plaintiff had had difficulty awaking, and, once he did, he was confused. Dr. Bennett discussed Plaintiff's diet with him and advised him to increase his exercise (R. 374).

On February 14, 2005, Plaintiff reported chest congestion and a cough to Dr. Bennett. Dr. Bennett noted Plaintiff's diabetes was stable. She prescribed Percocet for Plaintiff's osteoarthritis and Tussione for his bronchitis (R. 373).

<u>Administrative Hearing</u>

At the March 2, 2005, Administrative Hearing, Plaintiff testified he had married on August 7, 2004, and his wife worked as an assistant manager at a gas station/food store (R. 32). Plaintiff testified he rose at 7:00 a.m., ate breakfast, watched "a little" television, took his medication, perhaps read a book or the newspaper, ate lunch, napped for a couple hours, walked down the street, and watched television (R. 50-51). His wife prepared meals for him (R. 50). He drove between three and five times per week (R. 35). Plaintiff testified he did not do housework (R. 52). He stated he had no hobbies, but that he used to hunt, fish, pitch horseshoes, and work on cars (R. 52-53). Plaintiff stated he visited his aunt and his uncle (R. 53). He had been without the fingers on his right hand for almost thirty years and he'd not been able to learn to write with his left hand (R. 67).

Plaintiff stated he could sit for forty-five minutes and then he would "stiffen up." He testified he could stand for thirty-five to forty minutes, walk for a couple blocks, and could lift five to ten pounds. He limited his lifting due to chest pains (R. 51-52). Plaintiff testified his sleeping was sometimes limited to two hours per night, due to the pain (R. 53). Plaintiff testified Dr. Bennett recommended he walk four blocks for exercise (R. 55).

Plaintiff testified his main difficulty was diabetes, which was not controlled (R. 47). His diabetes would cause him to "black out at night" when he was sleeping and experience weakness. Plaintiff also stated his vision was affected a "little" due to diabetes, and it caused fatigue (R. 48-49). Plaintiff testified that he had had a heart attack in 2002, prior to his having stopped working[3] (R. 47-48). He visited his primary care physician monthly (R. 38). Plaintiff stated he had pain in

---

[3]The ALJ, in response to Defendant's testimony that he had suffered a heart attack, stated ". . . there's no medical evidence of a heart attack having occurred, and the tests are . . . normal" (R. 48).

his right hand, left shoulder, knees, and left hip, and that Dr. Bennett had diagnosed arthritis (R. 38, 39, 49). Plaintiff testified that the medication he took helped his symptoms and that he used a heating pad or damp towel for treatment (R. 38, 49). Dr. Bennett treated his left shoulder pain with hot towels once per month (R. 39). Plaintiff testified that Dr. Bennett had advised him to cease smoking because smoking had a negative affect on diabetes, but he still smoked one-half pack of cigarettes daily (R. 40).

The following question/answer exchange occurred between the ALJ and the VE:

ALJ: . . . [A]ssume a hypothetical individual of the Claimant's age. Is currently 47 years old, and education, which includes the completion of the eleventh grade, and the work experience that you just described,[4] who is limited to perform light work. And because of amputation of fingers on the right hand leaving only the thumb really can do a very limited type of pushing and pulling with that right hand. But, you know, can use the hand to push and pull if it's set up the right way, but can't grip, or grasp anything, so there'd be only occasional pushing and pulling. It'd be no gross manipulation, or handling with the right hand. No fine manipulation, or feeling with the right hand. No forceful or sustained gripping and grasping with the right hand. There would be only occasional bending at the waist, or occasional bending at the knees. Occasional kneeling. I'm going to say no crawling. Only occasional exposure to unprotected heights, or entrensigly [sic] [phonetic] hazardous uncovered moving machinery, and only occasional use of vibrating tools, and only occasional exposure to very cold temperatures. And in addition, there would be no detailed instruction, and no extended periods of concentration. And by extended periods I mean no more than 15 minutes would be required to mentally understand, and actively process a given task. There could be a number of such tasks during a workday. Could such a person perform any of the Claimant's past jobs, either as he actually performed them, or as they generally exist in the national economy?

---

[4]The VE described Plaintiff's quality control job, at which he lifted up to 100 pounds, as heavy exertional and the quality control job, at which he lifted thirty-five to forty pounds and inspected molding, as medium exertional work (R. 58-59). The VE described Plaintiff's warehouse worker job, at which he operated a forklift, as managerial. It was, therefore, skilled work performed at the medium exertional level (R. 58-59). The VE testified that the work as a delivery driver was generally classified as lower semi-skilled work and the exertional level would vary (R. 59-60).

VE:     No, sir. In the way that he actually performed them, now the inspector positions, as I say, normally are light, or there are inspector positions at the light exertional level, semi-skilled, and he could do those as . . . he did.

ALJ:    Then, you know, there are times when it becomes one – a question . . . as to whether a person does a job as is generally performed, or whether it was skilled and transferable to another job, which is as it's generally performed. You'd indicated that the quality control work was semi-skilled in nature. Are the skills transferable to other inspecting jobs that would be light, or not?

VE:     My opinion is that, no, it's almost job specific with the kind of work that he was doing.

ALJ:    . . . But on the other hand, there are light inspection jobs [that] generally exist?.

VE:     Yes, sir, there are. . . . Well this is certainly a gray area, because what he has actually been able to do is not according to the medical reports, or with the limitations that you're giving me.

ALJ:    . . . What about the other skills that he acquired? Are they transferable to other work consistent with these limitations?.

VE:     No, sir, I don't think so. The operator. There are light jobs with the supposedly transferrable – the jobs with the operating engineer jobs.

ALJ:    Well are you saying yes, or no – .

VE:     My opinion is that they are not transferrable.

ALJ:    . . . Then are there any unskilled? Is there unskilled work such a person could perform?

VE:     In terms of light unskilled work? Under the hypothetical that you gave me, the work as a sale's attendant would meet those limitations, and there's a – there are a number of those jobs. The reaching, handling is down to an occasional limit.

ALJ:    Well right. But the critical factor here is that the right arm is available only for gross support. Or the right hand is (R. 64). The . . . arm is all right. So there could be frequent use of the left hand. It's the bilateral problem that we got here. . . . Can you give me an estimate of numbers (for sale's attendant jobs)?

16

VE:     . . . [T]here's more than 170,000 of those jobs nationally and more than 5,700 within the two Virginias.

ALJ:    All right. Are there any other occupations?

VE:     I don't really think. I – maybe I'm thinking where I should be listening. The limitations . . . of reaching, handling, and fingering I've got it in my head with this gentleman, and maybe to such an extend that I'm clotting the issue. Would you go back over that, please?

ALJ:    Sure. This is light work that involves only occasional pushing and pulling with the dominant right hand, because he's only got an operational thumb on that hand. And he – can use his right hand, and arm for support purposes only, but can't engage in gripping, and grasping, or gross manipulation, or fine manipulation, or with that hand, or even feeling, except to the extend it could be done with the thumb only. There'd be only occasional exposure to very cold temperatures, and only occasional exposure to unprotected heights, or entrensigly [sic] hazardous uncovered moving machinery. It would be only – there would be no crawling, no climbing ladders. There'd be only occasional – and I think this is something I didn't mention. Well occasional climbing stairs, but occasional bending at the waist, or knees, or occasional kneeling.

VE:     I think he could do the job of the inspector positions. There's more of them. 133,000 of those with nationally, and about 4,000 of those within the region.

ALJ:    All right. And if I were to ask you to assume that the person is limited to – could only lift – well, excuse me. Let's just say they're limited to sedentary work, and had all of the other limitations that were mentioned, would there be work such a person could perform?.

VE:     Can the individual write? He's . . . right hand dominant, and . . . I had the feeling that . . . he has done checklists . . . .

ALJ:    Well let's assume that any significant handwriting would not be – could not be possible.

VE:Okay. Then I don't think there are jobs that he could do at the sedentary level.

(R. 61-67).

Plaintiff's lawyer asked the VE if the jobs of sales attendant and inspector accommodated

17

the ALJ's limitations on extended periods of concentration and "being no more than 15 minutes to process a particular task." The VE stated the jobs of sales attendant and inspector would accommodate those limitations (R. 68).

Evidence Submitted to Appeals Council

On September 19, 2005, Joe Pack, D.O., completed a consultative evaluation of Plaintiff's left hand at the request of Dr. Bennett. Plaintiff complained of pain, stiffness and discomfort along the metacarpal phalange joints. He denied numbness or tingling. Dr. Pack's examination revealed Plaintiff was in no apparent distress; had no swelling in his right hand; had tenderness upon palpation of his 2nd, 3rd, 4th, and 5th metacarpal phalange joints on his left hand; was stiff; had no pain over his wrist, extensor tendons, or flexor extensors; and his metacarpal phalange joints were neurovascularly intact. His x-rays were normal. Dr. Pack diagnosed "left hand pain, unknown etiology with some stiffness, possible connective tissue vs rheumatological process" (R. 387). He informed Plaintiff that he "did not know exactly what was going on" with his left hand and recommended Plaintiff undergo lab work to rule out connective tissue or rheumatological conditions (R. 387). He also recommended Plaintiff be examined by a hand specialist and that he treat his symptoms with anti-inflammatory medications (R. 388).

On February 14, 2005, Plaintiff reported chest congestion and a cough to Dr. Bennett. Dr. Bennett noted Plaintiff's diabetes was stable. She noted Plaintiff's review of systems as follows: chronic fatigue issues; history of eye injuries; wore glasses; blurred vision; glaucoma; chronic sinus problems, rhinitis; "multiple problems with chest pains, palpations, shortness of breath;" loss of appetite; and abdominal pain (R. 387). She prescribed Percocet for Plaintiff's osteoarthritis and Tussione for his bronchitis.

Dr. Bennett wrote a letter, directed "To Whom It May Concern," dated October 17, 2005, in which she opined Plaintiff could not "sustain exertion greater than a few minutes," due to diabetes and a 2002 myocardial infarction. Dr. Bennett wrote Plaintiff had to adjust his activity level to accommodate his disease. She wrote Plaintiff experienced periods of pain due a partial right hand amputation and that the pain was unpredictable and could interfere with Plaintiff's ability to concentrate. She opined Plaintiff could not lift, carry, pull, or push due to his partial right hand amputation. Dr. Bennett also noted Plaintiff had arthritis in his left hand, which caused him not to have the ability to use that hand to its full potential. She noted Plaintiff would need lifetime treatment for hyperlipidemia, coronary artery disease, asthma, and osteoarthritis, and opined Plaintiff was disabled and could "not maintain a reliable work schedule or perform work activities involving any exertion" (R. 386).

On November 18, 2005, Sheila V. Rose, M.S., a licensed psychologist, completed a psychological evaluation of Plaintiff. She noted Plaintiff drove to the appointment, was dressed and groomed appropriately, and was punctual. Ms. Rose observed Plaintiff was "winded" after climbing six steps to her office and "grimaced" in pain as he sat. She noted Plaintiff's left hand was "drawn up with arthritis, and he could not straighten it out easily" (R. 389).

Plaintiff informed Ms. Rose that he had Type I diabetes, osteoarthritis in his hands and both knees, hyperlipidemia, coronary artery disease, shortness of breath related to asthma, and a history of heart attack in 2002 (R. 390). Ms. Rose found Plaintiff's presenting symptoms were hopelessness, depressed mood, marital conflict over finances, anhedonia, restlessness, impaired concentration, difficulty falling and staying asleep, feelings of guilt, avoidance of equipment/machinery, and intolerance of crowds (R. 390).

Plaintiff reported his activities of daily living as follows: "meals and meds," taking a short walk, reading the newspaper "(repeatedly due to concentration difficulties)," watching television, interacting with children in his wife's daycare facility, attending church weekly, and visiting with friends once or twice per week (R. 393).

Ms. Rose noted Plaintiff's high school report card, dated December 19, 1975, showed that Plaintiff had "steadily" declining grades during his three years there. Ms. Rose found Plaintiff's school testing scores indicated that he was achieving "primarily" at the ninth and tenth grade levels as a junior, but his math level was eighth grade. Ms. Rose also reviewed the January, 2004, September, 2004, and January, 2005, letters and the September, 2004, Physical Capacities Evaluation from Dr. Bennett. She acknowledged Ms. Tate's March, 2004, psychological evaluation of Plaintiff. Ms. Rose noted Plaintiff had sought mental health treatment in New Jersey after his finger amputations but had not had any additional treatment since that time (R. 390).

Ms. Rose observed Plaintiff to be cooperative, but discouraged. He demonstrated normal social functioning skills. He was oriented times four. His mood was depressed. His affect was expressive and normal. His thought processes and content were normal. His insight was good and his judgment was mildly deficient. Plaintiff had no suicidal or homicidal ideations. His immediate memory and remote memory were normal but his recent memory was severely deficient "based on 0/3 recall after 30 minutes." Plaintiff's concentration was mildly deficient. His persistence was good but his pace was "slowed" due to arthritis and amputation. Plaintiff's psychomotor was restless (R. 391).

Plaintiff's Verbal IQ was 76; his Performance IQ was 68; and his Full Scale IQ was 70. Ms. Rose found the results were consistent with previous tests and Plaintiff's life history. She opined

Plaintiff fell in the borderline range of intellectual functioning (R. 392). Ms. Rose found the following: Axis I – major depressive disorder, recurrent, moderate; Axis II – borderline intellectual functioning; and Axis III – asthma, diabetes, osteoarthritis, history of heart attack, amputation of right fingers, and high cholesterol, by self report (R. 393). She opined Plaintiff's medical prognosis was poor and that the combination of Plaintiff's handicap, chronic illnesses, depression, and borderline intellectual functioning left "him with no resources to utilize in a work setting."

On March 30, 2006, Ms. Rose completed a Psychiatric Review Technique of Plaintiff, opining that Plaintiff met Listing 12.04 for affective disorders (depressive disorder) (R. 394)She found Plaintiff had moderate restriction of activities of daily living, mild difficulties in maintaining social functioning, and marked difficulties in maintaining concentration, persistence, or pace. She also found Plaintiff had had one or two repeated episodes of decompensation, each of extended duration (R. 404). Ms. Rose did not complete the "'C' Criteria of the Listings" section of the Psychiatric Review Technique (R. 405).

On May 16, 2006, Plaintiff completed a Persantine-Cardiolite stress test due to complaints of chest pain. The test was positive for inferoapical ischemia (R. 416, 417).

On May 31, 2006, cardiologist Haven N. Wall, Jr., M.D., completed a consultative examination of Plaintiff upon referral from Dr. Bennett. Plaintiff reported he had a myocardial infarction in 2001, but he had had no stents or surgery. Plaintiff reported coronary disease; chest pains; left anterior chest pain with heavy exertion, such as lifting; COPD with dyspnea on minimal exertion and asthma component; occasional indigestion; diabetes; high cholesterol; hypertension, and right hand finger amputation. Plaintiff denied thyroid problems, glaucoma, congestive failure, palpitations, peptic ulcer disease, gallbladder problems, peripheral edema, apnea, renal problems,

or liver problems. Plaintiff stated he smoked five cigarettes per day. Plaintiff stated he was "able to walk and get around pretty well without chest pain." Dr. Wall noted Plaintiff had "been relatively healthy." Plaintiff reported taking the following medications: Zocor, Plavix, Vasotec, Percocet, Coreg, Avandia, Isosorbide, Combivent, Advair, BroveX, NovoLog, Lantus insulin (R. 411).

Dr. Wall's physical examination revealed Plaintiff was alert, oriented, pleasant, and in no acute distress. His examination of Plaintiff's head, nose, throat, neck, carotid arteries, jugular venous, thyroid, trachea, abdomen, extremities, cranial nerves, gait, and blood pressure revealed normal results. Plaintiff's breath sounds were decreased, expiration prolonged, and rhythm regular. Plaintiff's heart sounds were muffled due to his COPD. Dr. Wall's found Plaintiff's weight to be "very good" (R. 411).

Dr. Walls noted Plaintiff's May 16, 2007 Persantine stress test showed inferoapical ischemia with an injection rate of fifty percent. He noted an EKG showed a normal sinus rhythm, "LVH by voltage, [and] old inferior MI." (R. 412).

On June 7, 2006, Plaintiff underwent an echocardiogram. Dr. Wall noted Plaintiff had normal sinus rhythm throughout. Plaintiff's ejection fraction was sixty-six percent. His posterior wall and septum contracted appropriately. Increased reflectivity was observed in the aortic and mitral valve leaflets. Plaintiff's leaflet opening was unrestricted. Plaintiff's "LA" was normal, his aortic root was normal, his aortic valve excursion was 2.08 cm, and his "RV" systolic pressure was normal. Dr. Wall noted hypertrophy in the "LV," and mild mitral regurgitation in the long axis view, but no aortic regurgitation. Plaintiff's inferior wall, lateral wall, anterior wall and septum contracted appropriately on the short axis view. His aortic valve was tricuspid. The apical four-chamber view showed the right and left ventricles and the septum contracted appropriately. No aortic, mitral,

tricuspid stenosis was noted. The apical four-chamber view showed "very mild mitral regurgitation." The subxyphoid view showed the inferior vena cava was not dilated and collapsed with inspiration (R. 415).

On June 20, 2006, Dr. Wall noted Plaintiff had occasional chest pains, but "nothing really classic." Dr. Wall did not have the report of Plaintiff's "cath," but opined Plaintiff had "all the risk factors." Dr. Wall noted he would "check an EKG" on that date. He found Plaintiff's "problem list" and medication list was unchanged. Dr. Wall ordered a "second cath with Dr. Goad" after July 4, 2006. Examinations of Plaintiff's "HENT," neck, lungs, and abdomen were normal. Plaintiff's heart rhythm was regular (R. 409).

Plaintiff was admitted to Alleghany Regional Hospital on September 26, 2006, and discharged on October 2, 2006 for nausea, bloody emesis, and weakness. During his hospitalization, he was diagnosed with diabetic ketoacidosis, which had been resolved at the time of discharge; acute sinusitis, which had been resolved at the time of discharge; hyperkalemia, with EKG change on admission, which had been resolved at the time of discharge; prerenal azotemia, which had improved at the time of discharge; and history of coronary artery disease and hyperlipidemia. When discharged, Plaintiff was prescribed Lantus, NovoLog, Vasotec, Nitroglycerin, Imdur, Zocor, Advair, Combivent, Levaquin, Nasonex, Plavix, Prevacid, and Tenormin (R. 419).

Upon admission, Plaintiff stated he had had two heart catheterizations, the first of which was angioplasty. Plaintiff reported he treated his heart condition with medication (R. 422). Plaintiff stated he smoked one-half pack of cigarettes per day (R. 433).

Alleghany Regional Hospital notes read that Plaintiff had transferred from the Pocahontas Hospital. His "glucose was quite high" when he was at Pocahontas Hospital, but he did not have

renal failure. He was treated at Alleghany Regional Hospital with an insulin drip. His x-ray showed COPD. An EKG showed mild sinus tachycardia and normal T-waves. Plaintiff was eating well (R. 420).

Evidence Submitted to the Court

On April 19, 2007, J.O. Othman, M.D., a neurologist, completed nerve conduction studies and a needle EMG of Plaintiff's bilateral upper extremities (Docket Entry 11-2, p. 1 of 5). Dr. Othman found Plaintiff had "[s]ignificant prolongation of the median motor and median sensory latencies consistent with bilateral carpal tunnel syndrome; the left side [was] severe while the right side [was] moderately severe;" "[s]ignificant drop in the velocity of the ulnar nerve bilaterally consistent with severe bilateral ulnar neuropathy across the elbows;; and "[s]ensory motor peripheral polyneuropathy most likely diabetic in nature" (R. Docket Entry 11-2, p. 2 of 5).

## III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 404.1520 (2000), ALJ Jones made the following findings:

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through at least the date of this decision.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant has a combination of impairments that is considered "severe" based on the requirements of 20 CFR § 404.1520(b).

4. The claimant's medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Part 404 of the Regulations.

5. The claimant's allegations regarding his functional limitations are not fully credible.

6.    All of the medical opinions in the record regarding the severity of the claimant's impairments were considered in reaching this decision (20 CFR § 404.1527).

7.    No period of 12 consecutive months has elapsed during which the claimant lacked the residual functional capacity to perform light work as defined in 20 CFR § 404.1567 that involves only occasional pushing or pulling with the right hand under circumstances where no gripping or grasping is required, occasional bending at the waist (stooping), occasional bending at the knees (crouching), occasional kneeling, no crawling, occasional climbing stairs, no climbing ladders, only occasional exposure to unprotected heights or hazardous machinery, no gripping or grasping with the right hand, no fine manipulation with the right hand, no feeling with the right hand, only occasional use of vibrating tools, only occasional exposure to very cold temperatures, no detailed instructions and no extended periods of concentration.

8.    The claimant's past relevant work as a quality control inspector did not require the performance of work-related activities precluded by his residual functional capacity (20 CFR § 404.1565).

9.    The claimant's medically determinable partial amputation of the right hand, osteoarthritis, diabetes mellitus, borderline intellectual functioning, coronary artery disease and a depressive disorder do not prevent him from performing his past relevant work.

10.   The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR § 404.1520(f)) (R. 25-26).

## IV.  DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept

to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (<u>quoting</u> <u>Consolidated</u>

<u>Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit

has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be

somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were

the case before a jury, then there is 'substantial evidence.'" <u>Hays</u>, 907 F.2d at 1456 (<u>quoting</u> <u>Laws</u>

<u>v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the

reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual

finding by the ALJ is not binding if it was reached by means of an improper standard or

misapplication of the law." <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987).

### B.  Contentions of the Parties

Plaintiff contends:

1.      The decision of the Commissioner to deny [Plaintiff] benefits was wrong and should
        be reversed:

      A.      The Commissioner failed to properly evaluate [Plaintiff's] testimony
                concerning the intensity, duration and limiting effect of his symptoms and
                pain.

      B.      The Commissioner erred as a matter of law in rejecting the opinion and
                assessment of [Plaintiff's] treating physician.

      C.      The ALJ erred in finding that [Plaintiff] could perform his past relevant work.

2.      The decision of the Commissioner should be remanded for consideration of
        new and material evidence.

The Commissioner contends:

1.      Substantial evidence supports the Commissioner's decision that Plaintiff retained the
        RFC to perform light work with modifications:

      A.      Plaintiff's statements regarding the intensity, duration and limiting effect of

his symptoms were not entirely credible.

B.    The opinion of Dr. Bennett was not entitled to controlling weight.

C.    Plaintiff has the RFC to perform his past relevant work as a quality control inspector.

2.    New evidence is not material to the relevant period and does not warrant remand.

## C. Credibility

Plaintiff argues that the Commissioner failed to properly evaluate his testimony concerning the intensity, duration and limiting effects of his symptoms. Defendant contends the Commissioner properly found Plaintiff's statements regarding his symptoms were not entirely credible. The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.1984) (citing Tyler v. Weinberger, 409 F.Supp. 776 (E.D.Va.1976)).

The Fourth Circuit has developed a two-step process for determination of whether a person is disabled by pain or other symptoms as announced in Craig v. Chater, 76 F. 3d 585 (4th Cir. 1996):

> 1) For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers*. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .
>
> 2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, *that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated*, *See* 20 C.F.R. §§ 416.929(c)(1) &

404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

Craig, supra at 594.

Here, the ALJ found that Plaintiff met the first, threshold step. He was therefore required to evaluate "all the available evidence" to determine the credibility of Plaintiff's alleged pain and limitations. The undersigned finds that the ALJ did evaluate all the evidence available at the time of his decision. In general, his findings of fact are correct, based upon the information he had before him at the time. The finding that Plaintiff "has not reported that the medication is ineffective" for his right hand pain is not supported by the evidence, as Plaintiff complained on numerous occasions to his treating physician that his hand still hurt. In fact, it was often his chief complaint. His doctor changed his pain prescription a number of times. The undersigned does not, however, find this error of fact sufficient on its own to reverse the ALJ's decision. The ALJ did limit Plaintiff to jobs with no detailed instructions and no extended periods of concentration, due in part, to his complaints of limited concentration due to pain.

Nevertheless, the undersigned finds the evidence, especially in conjunction with that submitted to the Appeals Council, does not support the Commissioner's decision that Plaintiff was not disabled. Plaintiff does not specifically argue that the Appeals Council erred, but does cite to records submitted only to the Appeals Council to support his argument that the ALJ erred in finding him not credible and in according Dr. Bennett's opinion reduced weight. In particular he notes the

28

medical evaluation dated September 19, 2005, by Dr. Pack, the medical evaluations dated May- June 2006 by Dr. Wall, and the treatment records dated September 26-October 2, 2006, from Alleghany Regional Hospital.

Pursuant to 20 CFR § 404.970(b), the Appeals Council shall consider evidence submitted with a request for review if the evidence is new, material, and relates to the period on or before the dates of the ALJ's decision.  Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome.  Wilkins v. Secretary, Dept. of Health and Human Services, 953 F.2d 93, 96 (4th Cir. 1991). Here, the Appeals Council did state that it considered the evidence submitted by Plaintiff.  See R. 6.  Regarding the new evidence, the Appeals Council simply states: "We found that this information does not provide a basis for changing the Administrative Law Judge's decision."  There is no further explanation.  The undersigned recognizes this issue has generated conflicting opinions in the District Courts of the Fourth Circuit.  The regulations do not require the Appeals Council to state its rationale for denying review.  See 20 C.F.R. § 404.970(b). The undersigned has generally not remanded cases simply because the Appeals Council failed to state its reasons for denying review.

Pursuant to Fourth Circuit precedent, the undersigned has reviewed the new evidence submitted to the Appeals Council along with the evidence received by the ALJ prior to his decision. See Wilkins, supra, in which the Fourth Circuit  held:

> The Appeals Council specifically incorporated Dr. Liu's letter of June 16, 1988 into the administrative record.  Thus, we must review the record as a whole, including the new evidence, in order to determine whether substantial evidence supports the Secretary's findings.  On this record, the finding that Wilkins did not become disabled prior to March 28, 1987 is not supported by substantial evidence.

On September 29, 2004, long before the Administrative Hearing, Plaintiff reported to Dr.

Bennett that he experienced difficulty breathing, left hand numbness and tingling, and right hand pain. Dr. Bennett diagnosed diabetes; right hand pain, for which she prescribed Percocet; asthma, for which she prescribed Advair; and carpal tunnel syndrome, for which she recommended stretching (R. 329, 378). Plaintiff consistently reported shortness of breath and chest pain.

The ALJ held the Administrative Hearing on March 2, 2005, and issued his decision on June 2, 2005. He did not find any left hand impairment or breathing impairment. He dismissed Plaintiff's complaints of chest pain because "no myocardial infarction . . . ha[s] been medically documented."

On September 19, 2005, only three months after the ALJ's decision, Joe Pack, D.O., completed a consultative evaluation of Plaintiff's left hand at the request of Dr. Bennett. Plaintiff complained of pain, stiffness, and discomfort along the metacarpal phalange joints of that hand. Dr. Pack's examination revealed tenderness upon palpation of the 2nd, 3rd, 4th, and 5th metacarpal phalange joints on Defendant's left hand along with stiffness. There was no pain over the wrist, extensor tendons, or flexor extensors, and the metacarpal phalange joints were neurovascularly intact. X-rays were normal. Dr. Pack diagnosed "left hand pain, unknown etiology with some stiffness, possible connective tissue vs rheumatological process" (R. 387). He told Plaintiff that he "did not know exactly what was going on" with his left hand and recommended Plaintiff undergo lab work to rule out connective tissue or rheumatological conditions (R. 387). Dr. Pack recommended Plaintiff be examined by a hand specialist and that he treat his symptoms with anti-inflammatory medications (R. 388).

Dr. Bennett wrote a letter, directed "To Whom It May Concern," dated October 17, 2005, in which she opined Plaintiff could not "sustain exertion greater than a few minutes," due to diabetes

and a 2002 myocardial infarction. She noted Plaintiff had to adjust his activity level to accommodate his disease. He experienced periods of pain due to a partial right hand amputation and the pain was unpredictable and could interfere with Plaintiff's ability to concentrate. Dr. Bennett opined Plaintiff could not lift, carry, pull or push due to his partial right hand amputation. She also opined Plaintiff had arthritis in his left hand, which caused him not to have the ability to use that hand to its full potential. Dr. Bennett noted Plaintiff would need lifetime treatment for hyperlipidemia, coronary artery disease, asthma, and osteoarthritis, and opined Plaintiff was disabled and could "not maintain a reliable work schedule or perform work activities involving any exertion."

On November 18, 2005, Sheila V. Rose, M.S., a licensed psychologist, completed a psychological evaluation of Plaintiff. Ms. Rose observed Plaintiff was "winded" after climbing six steps to her office and "grimaced" in pain as he sat. She noted Plaintiff's left hand was "drawn up with arthritis, and he could not straighten it out easily" (R. 389). She noted that his persistence was good, but his pace on tests was slowed due to arthritis and amputation.

On May 31, 2006, cardiologist Haven N. Wall, Jr., M.D., completed a consultative examination of Plaintiff upon referral from Dr. Bennett. Dr. Wall's physical examination revealed Plaintiff's breath sounds were decreased, expiration prolonged, and rhythm regular. His heart sounds were muffled due to COPD. Dr. Walls noted Plaintiff's May 16, 2007 Persantine stress test showed inferoapical ischemia with an injection of fifty percent. He noted an EKG showed a normal sinus rhythm, "LVH by voltage, old inferior MI." (R. 412)(emphasis added).

Plaintiff was hospitalized for nearly a week in September 2006, for nausea, bloody emesis, and weakness. He was diagnosed with diabetic ketoacidosis, which had been resolved at the time of discharge; acute sinusitis, which had been resolved at the time of discharge; hyperkalemia, with

EKG change on admission, which had been resolved at the time of discharge; prerenal azotemia, which had improved at the time of discharge; and history of coronary artery disease and hyperlipidemia. When discharged, Plaintiff was prescribed Lantus, NovoLog, Vasotec, Nitroglycerin, Imdur, Zocor, Advair, Combivent, Levaquin, Nasonex, Plavix, Prevacid, and Tenormin (R. 419).

Alleghany Regional Hospital notes read that Plaintiff had transferred from the Pocahontas Hospital. His "glucose was quite high" when he was at Pocahontas Hospital, but he did not have renal failure. He was treated at Alleghany Regional Hospital with an insulin drip. His x-ray showed COPD. An EKG showed mild sinus tachycardia and normal T-waves. Plaintiff was eating well (R. 420).

These records indicate that Plaintiff had problems with his left hand and was diagnosed with arthritis and/or carpal tunnel syndrome of that hand as well as his right; was diagnosed with COPD and asthma by objective testing; had had another hospitalization for uncontrolled diabetes despite compliance with medication; and had had an "old inferior" myocardial infarction. The ALJ, however, had found no breathing impairment whatsoever; no left hand impairment whatsoever; found Plaintiff's diabetes was controlled when he followed prescribed treatment; and found that there was no evidence Plaintiff had suffered a heart attack. He found Plaintiff was not credible in part due to the lack of evidence of a heart attack, which Plaintiff insisted he had had, and his claim of poorly controlled diabetes. He accorded the opinion of Plaintiff's treating physician little weight, based in part on her finding that Plaintiff had a history of heart attack and poorly controlled diabetes.

The undersigned finds that substantial evidence does not support the ALJ's finding that Plaintiff's complaints of pain and limitation were not credible.

Additionally, the ALJ did not find any breathing impairment, despite the fact that Plaintiff's

doctor had diagnosed asthma. Dr. Bennet opined that Plaintiff should never work around dust, fumes, gases or environmental pollutants. There are no such limitations in the ALJ's RFC, however. Evidence submitted to the Appeals Council indicates that not only did Plaintiff have asthma, but he was also diagnosed with COPD. These impairments may have contributed to Plaintiff's complained-of shortness of breath and chest pain. At the very least, the undersigned finds Plaintiff had a medically-determinable (if not severe) breathing impairment as well as a medically-determinable (if not severe) left hand impairment. 20 CFR § 404.1523 provides:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process . . . .

Having found neither a breathing impairment nor a left hand impairment, the ALJ clearly did not consider those impairments throughout his decision. Additionally, the ALJ specifically found that Plaintiff could frequently use his left (non-dominant) hand. His hypothetical to the VE contained the following:

> ALJ:    Well right. But the critical factor here is that the right arm is available only for gross support. Or the right hand is. The . . . arm is all right. So there could be frequent use of the left hand. It's the bilateral problem that we got here. . . .

(R. 64-65).

The undersigned finds substantial evidence, including that provided to the Appeals Council only, does not support the finding that Plaintiff could frequently use his left hand.

Regarding Plaintiff's complaint that his disability began after he suffered his heart attack, the

evidence to the Appeals Council indicates that at least one treating physician besides Dr. Bennett found Plaintiff had, indeed, suffered a heart attack, contrary to the ALJ's finding. That physician was a cardiologist.

Finally, the Appeals Council evidence that Plaintiff was again hospitalized about a year after the ALJ's decision for diabetic ketoacidosis and renal failure does not substantially support the ALJ's finding that Plaintiff's diabetes was uncontrolled only when he did not follow prescribed treatment.

## D. Treating Physician

As already noted, the Plaintiff's treating physician, Dr. Bennett, opined that Plaintiff was disabled due to longstanding, poorly controlled diabetes, a history of heart attack, traumatic amputation with sporadic pain, hyperlipidemia, and osteoarthritis (R. 359). The ALJ gave Dr. Bennett's opinion little weight if any, "because it is unsupported by objective clinical findings or tests results, by a clear medical rationale, or by Dr. Bennett's own records which note that the claimant has few complaints, generally feels well overall, and can control his diabetes when he follows prescribed treatment. The claimant obtains narcotic medication for complaints of right hand pain, but his right hand injury occurred in 1977 and he was able to work for 25 years despite that injury."

20 CFR Section 404.1527(e) provides:

Opinions on some issues, such as the examples that follow, are not medical opinions, as described in paragraph (a)(2) of this section, but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; *i.e.,* that would direct the determination or decision of disability.

(1) *Opinions that you are disabled.* We are responsible for making

34

the determination or decision about whether you meet the statutory definition of disability. In so doing, we review all of the medical findings and other evidence that support a medical source's statement that you are disabled. A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled.

Social Security ruling 96-2p provides, however:

When a Treating Source's Medical Opinion is not Entitled to Controlling Weight

Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

(Emphasis added).

Finally, the Fourth Circuit holds: "Although it is not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it." Craig v. Chater, 76 F. 3d 585, 589 (4th Cir. 1996). The treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Mitchell v. Schweiker, 699 F.2d 185 (4th Cir. 1983).

The undersigned finds that the evidence, including that submitted to the Appeals Council, indicating that Plaintiff had suffered a heart attack, had diagnosed left hand pain, diagnosed COPD and asthma, and was hospitalized for poorly controlled diabetes, all support Dr. Bennett's opinion. Moreover, there is no "persuasive contradictory evidence to rebut it."

The undersigned therefore finds that, considering all the evidence submitted to the ALJ and to the Appeals Council, the ALJ's finding that Dr. Bennett's opinion was entitled to reduced, if any, weight, is not supported by the evidence.

### E.  Hypothetical to the VE

Plaintiff next argues that the ALJ erred in finding that he could perform his past relevant work because "[t]he testimony of the vocational expert was not clear on this issue and should not be relied upon in making the decision."   Defendant contends Plaintiff has the residual functional capacity to perform his past work as a quality control expert, and that "there is no confusion regarding the VE's testimony about Plaintiff's ability to perform the quality inspector job." Because the undersigned has already found that the ALJ's credibility and RFC determinations are not supported by substantial evidence, it follows that his reliance on the VE's response to his hypothetical is also not supported by substantial evidence.

### F.  New and Material Evidence

Because the undersigned has already found that this case should be remanded to the Commissioner based on new evidence submitted to the Appeals Council, the undersigned does not address Plaintiff's claim that new evidence submitted to the Court provides the basis for remand.

### V.  RECOMMENDED DECISION

For the reasons above stated, I find that the Commissioner's decision denying the Plaintiff's application for DIB is not supported by substantial evidence. I accordingly recommend the Defendant's Motion for Summary Judgment be **DENIED,** the Plaintiff's Motion for Judgment on the Pleadings, or, in the Alternative, Motion for Remand for Consideration of New Evidence be **GRANTED IN PART** by a **REMAND** to the Commissioner  for further action in accordance with

this Recommendation for Disposition, and that this matter be dismissed and stricken from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, Jr., United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 26 day of June, 2008.


JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE